# United States Court of Appeals for the Federal Circuit

2008-5018

SHELDON PETERS WOLFCHILD, et al., ERNIE PETERS LONGWALKER, et al.,
SCOTT ADOLPHSON, et al., MORRIS J. PENDLETON, et al.,
BARBARA FEEZOR BUTTES, et al.,
WINIFRED ST. PIERRE FEEZOR, et al., AUTUMN WEAVER, et al.,
ARIES BLUESTONE WEAVER, et al., ELIJAH BLUESTONE WEAVER, et al.,
RUBY MINKEL, et al., LAVONNE A. SWENSON, et al., WILLIS SWENSON, et al.,
AARON SWENSON, et al., BEVERLY M. SCOTT, et al., LILLIAN WILSON, et al.,
MONIQUE WILSON, et al., SANDRA COLUMBUS GESHICK, et al.,
CHERYL K. LORUSSO, et al., JENNIFER K. LORUSSO, et al.,
CASSANDRA SHEVCHUK, et al., JASON SHEVCHUK, et al.,
JAMES PAUL WILSON, et al., EVA GRACE WILSON, et al.,
BENITA M. JOHNSON, et al., and KEVIN LORUSSO, et al.,

Plaintiffs-Appellees,

and

HARLEY D. ZEPHIER, SR., et al.,

Plaintiffs-Appellees,

and

ELIZABETH T. WALKER, WALKER GROUP,
and JOHN DOES 1-30,

Plaintiffs-Appellees,

and

GERTRUDE GODOY, et al., MICHAEL STEPHENS, et al., JESSE CERMAK, et al.,
DELORES KLINGBERG, et al., SALLY ELLA ALKIRE, et al.,
PIERRE GEORGE ARNOLD, JR., et al., and DENISE HENDERSON, et al.,

Plaintiffs-Appellees,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiffs-Appellees,

and

WINONA C. THOMAS ENYARD, et al., and JEFFREY ARNOLD KITTO, et al.,

Plaintiffs-Appellees,

and

MADALINE ROCQUE, et al., MARY TAYLOR (TATEWASTEWIN), et al.,
MARGARET (DUMARCE) PRESCOTT, et al., and JOSEPH COURSOLLE, et al.,

Plaintiffs-Appellees,
and

MARY BETH LAFFERTY, et al., ANITA D. WHIPPLE, et al.,
BONNIE RAE LOWE, et al., and LENOR A. SCHEFFLER BLAESER, et al.,

Plaintiffs-Appellees,
and

JULIA DUMARCE, et al.,

Plaintiffs-Appellees,
and

FRANCINE GARREAU HALL, et al.,

Plaintiffs-Appellees,
and

KRISTINE ABRAHAMSON, et al.,

Plaintiffs-Appellees,
and

VICTORIA ROBERTSON VADNAIS, et al.,

Plaintiffs-Appellees,
and

MARVEL JEAN DUMARCE, et al., and VIVIAN CORDELIA YOUNGBEAR, et al.,

Plaintiffs-Appellees,
and

DANNY LEE MOZAK, et al.

Plantiffs-Appellees

and

DAWN BURLEY, RAYMOND COURNOYER, SR., FRANCIS ELAINE FELIX,
REBECCA ELIZABETH FELIX, LYDIA FERRIS, LESLIE LEE FRENCH,
DAWN HENRY, SANDRA KIMBELL, JERRY ROBINETTE, VERA A. ROONEY,
DEBORAH L. SAUL, ROBERT LEE TAYLOR,

2

DANIEL M. TRUDELL, LAURA VASSAR, CHARLENE WANNA, KE ZEPHIER, and JOHN DOES 31-433,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellant.

Erick G. Kaardal, Mohrman & Kaardal P.A., of Minneapolis, Minnesota, argued for all plaintiffs-appellees Sheldon Peters Wolfchild, et al.

Robin L. Zephier, Abourezk & Zephier, PC, of Rapid City, South Dakota, for plaintiffs-appellees Harley D. Zephier, Sr., et al.

Elizabeth T. Walker, Walker Law LLC, of Alexandria, Virginia, for plaintiffs-appellees Walker Group, et al.

Jack E. Pierce, Pierce Law Firm, P.A., of Minneapolis, Minnesota, for plaintiffs-appellees Gertrude Godoy, et al.

Peter D. Gray, Halleland Lewis Nilan & Johnson PA, of Minneapolis, Minnesota, for plaintiff-appellee Lower Sioux Indian Community. Of counsel was Eric J. Magnuson.

Sam S. Killinger, Rawlings, Nieland Law Firm, of Sioux City, Iowa, for plaintiffs-appellees Winona C. Thomas Enyard, et al.

Scott A. Johnson, Johnson Law Group, of Minnetonka, Minnesota, for plaintiffs-appellees Madaline Rocque, et al.

Wood R. Foster, Jr., Siegel Brill Greupner Duffy & Foster P.A., of Minneapolis, Minnesota, for plaintiffs-appellees Mary Beth Lafferty, et al.

Gary J. Montana, Montana & Associates, of Osseo, Wisconsin, for plaintiffs-appellees Julia DuMarce, et al.

Nicole Nachtigal Emerson, Lynn, Jackson, Shultz & Lebrun, PC, of Sioux Falls, South Dakota, for plaintiffs-appellees Francine Garreau Hall, et al.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, of Saint Paul, Minnesota, for plaintiffs-appellees Kristine Abrahamson, et al.

Royce D. Edwards, Jr., of Joplin, Missouri, for plaintiffs-appellees Victoria Robertson Vadnais, et al.

of Britton, South Dakota, for plaintiffs-appellees Marvel Jean DuMarce, et al.

3

Barry P. Hogan, Renaud Cook Drury Mesaros, PA, of Phoenix, Arizona, for plaintiffs-appellees John Doe, 1-433, et al. Of counsel was Elizabeth T. Walker, Walker Law LLC, of Alexandria, Virginia.

Garrett J. Horn, Horn Law Office, of Yankton, South Dakota, for plaintiffs-appellees Lydia Ferris, et al.

Steven D. Gordon, Holland & Knight, LLP, of Washington, DC, for amicus curiae Shakopee Mdewakaton Sioux (Dakota) Community and Prairie Island Indian Community. With him on the brief were Phillip M. Baker-Shenk, and Philip R. Mahowald, of Welch, Minnesota. Of counsel on the brief were Kurt V. BlueDog, BlueDog, Paulson & Small, P.L.L.P., of Minneapolis, Minnesota; and Brian B. O'Neill, Faegre & Benson LLP, of Minneapolis, Minnesota.

Aaron P. Avila, Trial Attorney, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, for defendant-appellant. With him on the brief were Ron L. Tenpas, Assistant Attorney General and Laura Maroldy, Attorney.

Appealed from: United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

2008-5018

SHELDON PETERS WOLFCHILD, et al., ERNIE PETERS LONGWALKER, et al.,
SCOTT ADOLPHSON, et al., MORRIS J. PENDLETON, et al.,
BARBARA FEEZOR BUTTES, et al.,
WINIFRED ST. PIERRE FEEZOR, et al., AUTUMN WEAVER, et al.,
ARIES BLUESTONE WEAVER, et al., ELIJAH BLUESTONE WEAVER, et al.,
RUBY MINKEL, et al., LAVONNE A. SWENSON, et al., WILLIS SWENSON, et al.,
AARON SWENSON, et al., BEVERLY M. SCOTT, et al., LILLIAN WILSON, et al.,
MONIQUE WILSON, et al., SANDRA COLUMBUS GESHICK, et al.,
CHERYL K. LORUSSO, et al., JENNIFER K. LORUSSO, et al.,
CASSANDRA SHEVCHUK, et al., JASON SHEVCHUK, et al.,
JAMES PAUL WILSON, et al., EVA GRACE WILSON, et al.,
BENITA M. JOHNSON, et al., and KEVIN LORUSSO, et al.,

Plaintiffs-Appellees,

and

HARLEY D. ZEPHIER, SR., et al.,

Plaintiffs-Appellees,

and

ELIZABETH T. WALKER, WALKER GROUP,
and JOHN DOES 1-30,

Plaintiffs-Appellees,

and

GERTRUDE GODOY, et al., MICHAEL STEPHENS, et al., JESSE CERMAK, et al.,
DELORES KLINGBERG, et al., SALLY ELLA ALKIRE, et al.,
PIERRE GEORGE ARNOLD, JR., et al., and DENISE HENDERSON, et al.,

Plaintiffs-Appellees,

and

LOWER SIOUX INDIAN COMMUNITY,

Plaintiffs-Appellees,

and

WINONA C. THOMAS ENYARD, et al., and JEFFREY ARNOLD KITTO, et al.,

Plaintiffs-Appellees,

and

MADALINE ROCQUE, et al., MARY TAYLOR (TATEWASTEWIN), et al.,
MARGARET (DUMARCE) PRESCOTT, et al., and JOSEPH COURSOLLE, et al.,

Plaintiffs-Appellees,

and

MARY BETH LAFFERTY, et al., ANITA D. WHIPPLE, et al.,
BONNIE RAE LOWE, et al., and LENOR A. SCHEFFLER BLAESER, et al.,

Plaintiffs-Appellees,

and

JULIA DUMARCE, et al.,

Plaintiffs-Appellees,

and

FRANCINE GARREAU HALL, et al.,

Plaintiffs-Appellees,

and

KRISTINE ABRAHAMSON, et al.,

Plaintiffs-Appellees,

and

VICTORIA ROBERTSON VADNAIS, et al.,

Plaintiffs-Appellees,

and

MARVEL JEAN DUMARCE, et al., and VIVIAN CORDELIA YOUNGBEAR, et al.,

Plaintiffs-Appellees,

and

DANNY LEE MOZAK, et al.

Plaintiffs-Appellees,

and

DAWN BURLEY, RAYMOND COURNOYER, SR., FRANCIS ELAINE FELIX,
REBECCA ELIZABETH FELIX, LYDIA FERRIS, LESLIE LEE FRENCH, DAWN
HENRY, SANDRA KIMBELL, JERRY ROBINETTE, VERA A. ROONEY, DEBORAH L.
SAUL, ROBERT LEE TAYLOR,
DANIEL M. TRUDELL, LAURA VASSAR, CHARLENE WANNA, KE ZEPHIER,
and JOHN DOES 31-433,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellant.


Appeal from the United States Court of Federal Claims in case 03-CV-2684,
Judge Charles F. Lettow.

_____

DECIDED: March 10, 2009

_____


Before RADER, BRYSON, and PROST, Circuit Judges.

BRYSON, Circuit Judge.

This case comes to us on interlocutory appeal from the Court of Federal Claims. The plaintiffs in the underlying action claimed that the government breached its fiduciary obligations with respect to certain real property that the government was required to hold in trust for them. The order on appeal sets forth two questions of law as to which the trial court concluded that there is a substantial ground for difference of opinion and that an immediate appeal could materially advance the ultimate termination of the litigation. See 28 U.S.C. § 1292(d)(2). We address those two questions of law in this opinion and reverse the trial court's ruling as to each question.

I

The trial court's opinions contain a thorough canvass of the complex factual and legal background of this case. See Wolfchild v. United States, 62 Fed. Cl. 521, 526-35 (2004) (Wolfchild I); Wolfchild v. United States, 68 Fed. Cl. 779, 782-83, 785-94 (2005) (Wolfchild II). We borrow heavily from the trial court's analysis of the facts and the governing legal principles, even though at the end of the day we disagree with the trial court's legal conclusions as to the two questions certified for appeal.

A

In 1862, the Minnesota Sioux, who were then living on a reservation in southern Minnesota, rebelled against the United States. After the uprising was quelled, Congress annulled the treaties that had established the reservation and that had provided for an annuity to be paid to the tribe. See Act of Feb. 16, 1863, ch. 37, 12 Stat. 652; Act of Mar. 3, 1863, ch. 119, 12 Stat. 819. The effect of that action was to confiscate all of the tribe's reservation lands in Minnesota and force the Sioux to relocate farther west.

During the uprising, some of the Sioux remained loyal to the United States. Many of those individuals severed their ties to the tribe and remained in Minnesota. However, the government's confiscation of the Sioux lands and the termination of the annuities that were paid pursuant to the annulled treaties left those individuals poverty-stricken and homeless. In recognition of their situation, Congress took steps to assist those individuals. The group, which consisted of approximately 200 individuals, were known as the "loyal Mdewakantons," a reference to the Mdewakanton band of the Sioux tribe with which they had been affiliated.

In the 1863 statute that annulled the Sioux treaties, Congress authorized the Secretary of the Interior to set aside parcels of 80 acres of public land for any individual among the Minnesota Sioux "who exerted himself in rescuing the whites" during the 1862 revolt. Act of Feb. 16, 1863, § 9, 12 Stat. at 654. Congress further provided that the allotted land "shall not be subject to any tax, forfeiture, or sale, by process of law, and shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever." Id. Two weeks after the enactment of that provision, however, Congress superseded it with another statute dealing with the same authorization. Unlike in the earlier statute, Congress did not attempt to define the property interest that the Indians would receive in lands that were to be set aside for them. Instead, the later statute provided that any lands that were assigned would be "held in such tenure as is or may be provided by law." Act of Mar. 3, 1863, § 4, 12 Stat. at 819. Thus, in that statute (as was to be the case on several subsequent occasions), the issue of the ownership rights in the land that was to be set aside for the use of the loyal Mdewakantons was not resolved, but was left for later determination.

The Secretary never exercised the authority granted by the 1863 legislation, and no lands were provided to the loyal Mdewakantons at that time, apparently because of opposition by white settlers to allowing even the loyal Sioux to settle in the state. See H.R. Exec. Doc. No. 39-126, at 10 (1865) ("Congress . . . provided lands [for the loyal Mdewakantons] near their old homes, but [they] are not allowed by the whites to live upon and cultivate them"); H.R. Exec. Doc. No. 50-61, at 2 (1889) (the Secretary withdrew property from the public lands for the loyal Mdewakantons, "but such was the

blind fury of the whites after the outbreak of 1862 and 1863 that these Indians were also removed").

Two years later, however, Congress recognized that those individuals, who "at the risk of their lives aid[ed] in saving many white men, women, and children from being massacred," had as a result been forced to sever their relationships with the tribe and "were compelled to abandon their homes and property, and are now entirely destitute of means of support." Act of Feb. 9, 1865, ch. 29, 13 Stat. 427; see H.R. Exec. Doc. No. 39-126, at 3. Congress at that time appropriated $7,500 to provide for the loyal Mdewakantons, but it took no further action to assist them until the 1880s. In the intervening years, many of the loyal Mdewakantons, who were impoverished and faced continuing hostility from white settlers, left Minnesota. See Roy W. Meyer, History of the Santee Sioux 258-72 (1967).

On several occasions beginning in 1884, Congress appropriated funds to be used for the benefit of the Mdewakantons who had remained in Minnesota or had returned to the state. In 1884, Congress appropriated $10,000 to purchase stock "and other articles necessary for their civilization and education, and to enable them to become self-supporting." Act of July 4, 1884, ch. 180, 23 Stat. 76, 87. The following year, Congress amended that Act to allow the Secretary of the Interior to disburse funds to the Mdewakantons "for agricultural implements, lands, or cash, as in his judgment may seem best for said Indians." Act of Mar. 3, 1885, ch. 341, 23 Stat. 362, 375. And in the next year, Congress appropriated another $10,000 for the purchase of "such agricultural implements, cattle, lands, and in making improvements thereon, as in [the

Secretary's] judgment may seem best for said Indians."  Act of May 15, 1886, ch. 333, 24 Stat. 29, 39-40.

Under the authority of those statutes, Interior Department officials purchased land and distributed it to several of the loyal Mdewakantons, giving them fee simple ownership of the properties.  Sixtieth Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior 111 (1891).  That effort failed to provide long-term relief for the Mdewakantons, however, because as Interior Department officials later acknowledged, most of the recipients of the land grants sold, abandoned, or encumbered the properties.  After that time, the Interior Department discontinued the practice of transferring land to the loyal Mdewakantons in fee.

In 1888, 1889, and 1890, Congress enacted the three pieces of legislation that are the central focus of this case.  In each of those statutes, which are referred to in this litigation as "the Appropriations Acts," Congress appropriated funds for the support of a number of designated Indian tribes.  Each Act contained, among the many designated appropriations for the support of particular groups of Indians, a paragraph allocating a small sum to be used for the benefit of the Mdewakantons who had remained in Minnesota after the 1862 revolt or had returned to Minnesota in the following years.  See Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29 ($20,000); Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93 ($12,000); Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 ($8,000).  The Secretary of the Interior was authorized to spend those appropriated funds as he saw fit for the benefit of the qualifying Mdewakantons.  The statutes authorized the purchase of agricultural implements, cattle, horses, food, clothing, buildings, seed, or land, at the discretion of the Secretary.

Although each of the Appropriations Acts used slightly different language, the operative provisions were largely similar. The 1890 Act, for example, provided as follows, in pertinent part:

> For the support of the full and mixed blood Indians in Minnesota heretofore belonging to the Medewakanton band of Sioux Indians, who . . . have severed their tribal relations, eight thousand dollars, to be expended by the Secretary of the Interior as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each of these Indians or families thereof . . . .

26 Stat. at 349. The 1889 and 1890 Acts also provided that the appropriated funds should be "so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable, an equal amount in value of this appropriation." 25 Stat. at 992-93; 26 Stat. at 349. Although the 1888 Act contained no such proviso, the 1889 Act stipulated that the "equal amount" requirement should apply to the funds appropriated under the 1888 Act. 26 Stat. at 993. Two other differences among the three statutes are (1) the 1888 and 1889 Acts made provision for "full blood" Mdewakantons, while the 1890 Act made provision for "full and mixed blood" Mdewakantons, and (2) the 1889 and 1890 Acts gave the Secretary discretion to make spending decisions based on what he deemed best in the case of "each of these Indians or families thereof," while the 1888 Act made no reference to the beneficiaries' families.

The Interior Department used approximately $15,600 of the $40,000 appropriated under the three Appropriations Acts to purchase parcels of land in various parts of southern Minnesota where the Mdewakantons had settled. Because of difficulties in determining which of the Mdewakantons qualified as "loyal" during the

1862 uprising, the Appropriations Acts provided that the appropriations would be designated for the benefit of all Mdewakantons who were living in Minnesota as of May 20, 1886. As a result, the lands purchased with funds from the three Appropriations Acts are known as "the 1886 lands," and the Mdewakantons who were statutorily eligible for benefits under the Acts are commonly referred to as "the 1886 Mdewakantons."[1] Title to those lands was taken in the name of the United States, and the deeds contained no trust designation or other limitation on title.

As of 1980, notwithstanding several intervening exchanges and sales, the 1886 lands remained largely intact. The lands consisted of a number of small plots, totaling approximately 950 acres. The tracts were located in three Minnesota counties: Scott County ("the Shakopee lands"); Redwood County ("the Lower Sioux lands"); and Goodhue County ("the Prairie Island lands"). The Department of the Interior assigned individual plots from those lands to qualifying Mdewakantons for their use and occupancy as long as they resided on or otherwise used the land. After a particular assignee died or abandoned the property, the Department would re-assign the land to another qualifying Mdewakanton. The new assignment was often made to a descendant of the previous assignee. The Interior Department, however, did not regard the interest of the assignees in the property as rights that passed through inheritance.

Pursuant to the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, three Mdewakanton communities were formed in the three areas where the 1886 lands were

---

[1] In several years after the Appropriations Acts, Congress appropriated funds for the "support and civilization" of the Mdewakantons in Minnesota. See, e.g., Act of Mar. 2, 1895, ch. 188, 28 Stat. 873, 892; Act of June 10, 1896, ch. 398, 29 Stat. 321, 338; Act of June 7, 1897, ch. 3, 30 Stat. 62, 78; Act of July 1, 1898, ch. 545, 30 Stat. 571, 586; Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 938. Those later statutes, however, did not specifically authorize purchases of land, and the parties have not put those statutes at issue in this case.

located.  The three communities are the Prairie Island Indian Community, the Shakopee Mdewakanton Sioux Community, and the Lower Sioux Indian Community.  The enrolled membership of the three communities consists largely of lineal descendants of the Mdewakantons who were living in Minnesota in 1886, but some enrolled members are not descendants of the 1886 Mdewakantons, and many of the descendants of the 1886 Mdewakantons are not enrolled members of any of the three communities.[2]  Over time, the government purchased an additional 414 acres for the Prairie Island community and an additional 872.5 acres for the Lower Sioux community.  Those lands were regarded as reservation lands and as such were held in trust for those two communities.  Prior to 1980, those reservation lands were treated as having a legally distinct status from the 1886 lands, even though parcels of the two classes of property were intermingled in the same areas within the geographical boundaries of the Prairie Island and Lower Sioux communities.

In 1980, Congress enacted legislation designed to give the three communities political control over all the property within the communities that had been set aside for Indians, including the 1886 lands.  In particular, the legislation sought to overcome the administrative problems that resulted from the communities having two different classes of members and two different classes of property interspersed in a "checkerboard pattern" within their geographical boundaries.  See S. Rep. No. 96-1047, at 2 (1980).  In order to solve that problem, the 1980 statute provided that the 1886 lands, which "were

---

[2]      As of 1979, more than 95 percent of the enrolled members of the three communities were lineal descendants of the 1886 Mdewakantons.  At that time, the Lower Sioux Indian Community had 152 members (139 of whom were lineal descendants of the 1886 Mdewakantons), the Prairie Island Indian Community had 109 members (106 of whom were lineal descendants of the 1886 Mdewakantons), and the Shakopee Mdewakanton Sioux Community had 96 members (94 of whom were lineal descendants of the 1886 Mdewakantons).

acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians" under the Appropriations Acts, would henceforth be "held by the United States . . . in trust for" the three communities. Pub. L. No. 96-557, 94 Stat. 3262 (1980). The 1980 Act contained a savings clause stating that the Act would not alter any rights under any contract, lease, or assignment entered into or issued prior to the Act. Thus, all of the individuals then holding assignments to the 1886 lands retained their rights to use the land unaffected by the 1980 legislation. The Interior Department, however, made no new assignments thereafter.

B

For more than a century after the purchase of the 1886 lands, those properties were used mainly for residential and agricultural purposes and were not particularly valuable.[3] However, following the introduction of casino gambling on Indian land in the mid-1990s, the situation changed dramatically. According to the complaint in this case, "profitable casinos, hotels, and other profit-making businesses have been established and developed" on the 1886 lands. As a result, the proceeds from certain of those lands and the nearby reservation lands have become extremely valuable.

Because of the position taken by the Department of the Interior that the disputed properties are held in trust for the three Mdewakanton communities, the descendants of the 1886 Mdewakantons who are not members of those communities have not received any of the proceeds from the gambling casinos and related entertainment facilities. Instead, those proceeds have gone to the enrolled members of the three communities.

---

[3] At the time of the 1980 Act, the Interior Department estimated that the 950 acres constituting the 1886 lands were worth a total of approximately $1,500,000.

In 2003, a group of individuals who claimed to be lineal descendants of the 1886 Mdewakantons filed suit in the Court of Federal Claims seeking damages from the United States based in part on an asserted breach of fiduciary duty. Over time, more individuals have joined the suit as plaintiffs, and the plaintiffs now number more than 20,000.

The plaintiffs' theory of the case was that the Appropriations Acts created a trust for the 1886 Mdewakantons and their descendants that gives the plaintiffs rights to the proceeds of the trust corpus because of their status as owners of equitable title to those lands. Wolfchild I, 62 Fed. Cl. at 540. They contended that the 1980 statute did not terminate that trust and that it was improper for the government, following the enactment of the 1980 statute, to treat the 1886 lands as being held in trust for the benefit of the three communities. Instead, they asserted, the proceeds of the 1886 lands should have gone to the lineal descendants of the 1886 Mdewakantons, the intended beneficiaries of the lands that were purchased with the Appropriations Acts funds. According to the complaint, each of the plaintiffs was entitled to a prorated share of "the income, profits and proceeds from all reservation lands at Shakopee, Prairie Island, and Lower Sioux (including but not limited to per-capita payments from casino profits and other revenues)." The complaint further alleged that the government has breached its fiduciary duties by failing "to ensure that the income, profits and proceeds from all reservation businesses—including per-capita payments from casino profits—are distributed as equally as practicable among all of the trust beneficiaries of the reservation lands."

The government responded that the Appropriations Acts did not create a trust for the 1886 Mdewakantons and did not give the 1886 Mdewakantons vested ownership rights in the lands purchased with those funds. Instead, according to the government, the Appropriations Acts simply gave the Secretary of the Interior the right to purchase land or other assets to be used, subject to the Secretary's discretion, for the benefit of the 1886 Mdewakantons and their families. In the government's view, the Secretary exercised his discretion to allow the 1886 Mdewakantons and their descendants to use and occupy the land, but neither the Appropriations Acts nor any action by the Secretary conveyed any greater interest, such as legal or equitable title, on any of the beneficiaries, either individually or as a class. In addition, the government argued that after Congress in 1980 enacted legislation providing that the 1886 lands would be held in trust for the three Mdewakanton communities, the lineal descendants of the 1886 Mdewakantons retained no rights in the lands except insofar as they were enrolled members of one of the three communities or were current assignees whose rights were preserved under the 1980 Act's savings clause.

After considering submissions from the parties and the three Indian communities,[4] the trial court concluded that the plaintiffs were correct in their contention that the Appropriations Acts created a trust relationship between the government and

_____

[4] The three communities have not all taken the same position in this litigation. Two of the communities, the Shakopee Mdewakanton Sioux Community and the Prairie Island Indian Community, participating as amici curiae, are aligned against the plaintiffs. The third community, the Lower Sioux Indian Community, participating as an appellee, is aligned with the plaintiffs. The Lower Sioux Indian Community has explained that the most profitable casinos are on the properties of the other two communities. That may account for the decision of the Lower Sioux Indian Community, many of whose members claim to be lineal descendants of the 1886 Mdewakantons, to support the plaintiffs rather than advocating that each of the three communities is entitled to beneficial ownership of the portions of the 1886 lands allocated to it in 1980.

the 1886 Mdewakantons, that the trust relationship extended to the descendants of the 1886 Mdewakantons, and that the trust had the effect of bestowing equitable title to the 1886 lands on the beneficiary class. Wolfchild I, 62 Fed. Cl. at 540-43, 551, 549, 551. The court also ruled that the 1980 statute that required the government to hold the 1886 lands in trust for the three Indian communities did not have the effect of altering or terminating the trust that was established by the Appropriations Acts. Id. at 543-44, 551. Accordingly, the court concluded, the 950 acres that were purchased with the funds appropriated under the three Appropriations Acts continued to be held in trust for the heirs of the 1886 Mdewakantons, and the government breached its fiduciary duties to the plaintiffs respecting that trust. Id. at 545, 551.

The court's rulings that the Appropriations Acts created a trust for the loyal Mdewakantons and their descendants and that the 1980 statute did not terminate that trust are central to the plaintiffs' breach-of-trust claim and are critical prerequisites to any further proceedings in the trial court, such as identifying which plaintiffs are entitled to relief and calculating the measure of damages due to various groups of plaintiffs. Accordingly, the trial court certified the following two questions for immediate review by this court pursuant to 28 U.S.C. § 1292(d)(2):

(1)   Whether a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriations Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus; and

(2)   If the Appropriations Acts created such a trust, whether Congress terminated that trust with enactment of the 1980 Act.

We agreed to permit an appeal to be taken from the trial court's order, and we now undertake to answer the two certified questions.

II

Although the 1888, 1889, and 1890 Appropriations Acts make no reference to a trust, the trial court held that those statutes created a trust for the Mdewakantons who were living in Minnesota in 1886 and their descendants. The court ruled that all of the elements of a trust were present in the Appropriations Acts and that the absence of the term "trust" from the Acts was not fatal to interpreting them as imposing trust responsibilities on the government. The court regarded the corpus of the trust as the lands purchased with the funds appropriated pursuant to the Appropriations Acts. It found the beneficiaries to be sufficiently identified as the 1886 Mdewakantons and their families, including their descendants. It held that the trust obligations were sufficiently defined by the statutory requirements that the appropriated funds be expended for the benefit of the 1886 Mdewakantons and that they be expended, as nearly as practicable, so that each of the beneficiaries would receive a roughly equal amount in value from the expenditure of the appropriated funds. Finally, the court concluded that, as a consequence of the creation of the trust relationship, legal title to the 1886 lands remained in the United States, but the 1886 Mdewakantons and their descendants obtained equitable title to the lands. Wolfchild I, 62 Fed. Cl. at 540-43.

While it is true that a statute need not contain the word "trust" in order to create a trust relationship, the failure to use that term gives rise to doubt that a trust relationship was intended. See Cohen's Handbook of Federal Indian Law § 5.05[1][b], at 429-30 (Nell Jessup Newton et al., eds., 2005) ("[W]hile the presence of the word 'trust' in a statute by itself is neither necessary nor sufficient to create a compensable claim, statutory or regulatory language using terms normally associated with trust or fiduciary

law will be given great weight in the analysis."); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 480-81 (2003) (Ginsburg, J., concurring) (distinguishing between a statute that "expressly and without qualification employs a term of art ('trust') commonly understood to entail certain fiduciary obligations" and a statute that contained no trust language and "lacked the characteristics that typify a genuine trust relationship"). That is particularly true where, as here, Congress used the term "trust" in other contemporaneous statutes dealing with the same subject matter, but did not use that term or any close proxy in the Appropriations Acts. See, e.g., General Allotment Act of 1887, ch. 119, § 5, 24 Stat. 388, 389 (providing that United States will hold allotted land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made"); Act of May 1, 1888, ch. 213, art. 6, 25 Stat. 113, 115 (United States to hold land "in trust"); Act of Mar. 2, 1889, ch. 405, § 11, 25 Stat. 888, 891 (same).

The Restatement of Trusts sets forth the general principle of trust law that a trust is created "only if the settlor properly manifests an intention to create a trust relationship." Restatement (Third) of Trusts § 13 (2003). The Appropriations Acts manifest no such intention on the part of Congress. Although the Appropriations Acts impose some limited restrictions as to how the appropriated funds are to be spent, those restrictions are consistent with the kinds of directions that are routinely contained in appropriations statutes dictating that the appropriated funds are to be spent for a particular purpose. The simple statutory directives as to the expenditures authorized by the Appropriations Acts do not evidence an intention on Congress's part to create a legal relationship between the Secretary of the Interior and the 1886 Mdewakantons in

which the Secretary was assigned particular duties as trustee and the Mdewakantons were given enforceable rights as trust beneficiaries. If the minimal directives given to the Secretary as to the expenditure of funds were sufficient to convert the Appropriations Acts into trust instruments, it would seem that other similar, contemporaneous appropriations for the support of other groups of Indians could also be characterized as creating trust responsibilities, even though in none of those instances is there any objective evidence of congressional intention to create a trust.

Each of the three provisions that authorized expenditures for the 1886 Mdewakantons was enacted as part of a much longer statute that contained appropriations for payment of the expenses of the Indian Department and for the support of certain Indian tribes. The provisions effecting an appropriation for the Indian Department and those authorizing support for particular groups of Indians contained no language suggestive of a trust relationship. It is difficult to read the paragraphs relating to the 1886 Mdewakantons as creating a trust relationship when the surrounding paragraphs of the same statutes, which provide for the support of other groups of Indians, are clearly just appropriation provisions that do not create trust obligations. See, e.g., Act of June 29, 1888, ch. 503, 25 Stat. at 230 ("For support and civilization of the Chippewas of Lake Superior, to be expended for agricultural and educational purposes, pay of employees, purchase of goods and provisions, and for such other purposes as may be deemed for the best interests of said Indians, five thousand dollars"); Act of Mar. 2, 1889, ch. 412, 25 Stat. at 995 ("To enable the Secretary of the Interior to purchase subsistence and other necessaries for the support of the Hualapais Indians in Arizona, seven thousand five hundred dollars"); Act of Aug. 19, 1890, ch. 807,

26 Stat. at 352 ("For support and education of the Seminole and Creek Indians in Florida, for the erection and furnishing of school-houses, for the employment of teachers, and for the purchase of seeds and agricultural implements and other necessary articles, six thousand dollars; this money, or any part of thereof, may be used, in the discretion of the Secretary of the Interior, for the purchase of land for homes of said Seminole Indians").

The only significant difference between the Appropriations Acts and the other Indian "support" appropriations that were part of the same legislation is that the latter two Appropriations Acts contained a requirement that each of the beneficiaries "shall receive, as nearly as practicable, an equal amount in value of this appropriation." That clause, which the record materials suggest was added because of complaints that the funds from an earlier appropriation were disproportionately distributed, provides such minimal direction that it is plainly insufficient to convert what would otherwise be an appropriation into a trust.

The 1889 Act provided that any appropriated funds from that Act or the 1888 Act that were not spent during the current fiscal year "shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians." Act of Mar. 2, 1889, 25 Stat. at 992. Although the trial court concluded that the presence of that carry-over provision in the 1889 Act helped demonstrate Congress's intent to create a trust for the Mdewakantons, the contemporaneous history of the provision actually supports the contrary inference. The provision was included in the 1889 Act, apparently without comment, but when the same language was proposed to be included in the 1890 Act, it was removed after

members of Congress objected that it would be "remarkable" to include such a provision in an appropriations bill. 21 Cong. Rec. 7586 (1890) (remarks of Sen. Cockrell). The fact that Congress removed the carry-over provision from the 1890 Act because it was deemed to be inappropriate for an appropriations bill supports the government's argument that Congress viewed the Mdewakanton clauses of the Appropriations Acts as ordinary appropriations provisions.

The Lower Sioux Indian Community argues that the placement of the Appropriations Acts under the heading "Fulfilling Treaty Stipulations with and Support of Indian Tribes" indicates that those appropriations conveyed equitable title to the 1886 lands to the loyal Mdewakantons and their descendants. See Quick Bear v. Leupp, 210 U.S. 50, 77, 80 (1908) (distinguishing between Indian funds appropriated under the heading "Fulfilling Treaty Stipulations with and Support of Indian Tribes," which were administered on behalf of the Indians by the government, with funds appropriated under the subcategory "Support of Schools," which constituted a mere gratuitous appropriation of public monies). Unlike the appropriation at issue in Quick Bear, however, the Appropriations Acts were not enacted pursuant to any treaty with the Mdewakantons, and therefore cannot fairly be characterized as "payment . . . of a treaty debt in installments." See id. at 81. Furthermore, although the Appropriations Acts were not placed in the sections entitled "Miscellaneous Supports," each of the three expenditures was explicitly appropriated "[f]or the support of" loyal Mdewakantons. See 25 Stat. at 228; 25 Stat. at 992; 26 Stat. at 349. That is not the language typically used in clauses directed at fulfilling treaty obligations, and it is in fact analogous to the language used in the expenditures deemed to be gratuitous appropriations in the Quick Bear case. See

<u>Quick Bear</u>, 210 U.S. at 77.  Thus, the placement of the Mdewakanton clauses in the Appropriations Acts does not support the contention that the Appropriations Acts constituted a conveyance of trust property.

Finally, nothing in the legislative history of the three provisions at issue in this case indicates that they were designed to create a trust relationship.  Instead, the sponsors of the special provisions for the Mdewakantons referred to them as the intended "beneficiaries of this appropriation," 18 Cong. Rec. 2977 (1888) (remarks of Rep. McDonald), and characterized the payment as "a gratuity to these peaceable Indians, because they were peaceable and because they suffered at the hands of other Indians on account of their loyalty to the United States," 21 Cong. Rec. 7587 (remarks of Sen. Dawes), and "a gratuity to the amount stated in this bill to these Indians who have thus remained faithful to civilization and humanity in the most trying period which the people of my State were ever called upon to go through," 21 Cong. Rec. 7588 (1890) (remarks of Sen. Dawes).  The language and context of the Appropriations Acts thus strongly support the view that those provisions constituted simple appropriations, and did not create a trust relationship.

Recognizing that the language and legislative history of the Appropriations Acts do not provide compelling evidence that the Acts created a trust, the trial court based its decision principally on the context in which the Acts were enacted and on the contemporaneous and subsequent treatment of the 1886 lands by the Department of the Interior and Congress.  <u>Wolfchild I</u>, 62 Fed. Cl. at 541-43.  We have examined all of the legislative and administrative materials referred to by the court and called to our attention by the parties.  While the legal issue is a complex one and untangling the

historical materials is difficult, we conclude that the Appropriations Acts are best interpreted as merely appropriating funds subject to a statutory use restriction, and not creating a trust relationship through which the 1886 Mdewakantons and their descendants obtained beneficial ownership rights in the 1886 lands.[5]

The analysis of this issue is further complicated by the fact that, in the years between 1888 and 1980, Interior Department officials at times characterized the 1886 lands as being held in trust for the 1886 Mdewakantons and their descendants. What is important, however, is not what terms were used to refer to the relationship between the government and the beneficiaries of the Appropriations Acts, but the substance of what Congress did through the Appropriations Act and what, if any, property interest the beneficiaries obtained in the 1886 lands as a result. On that issue, as we shall see, the Interior Department's policy remained unchanged from the 1890s until 1980. The Department's consistent position was that the United States owned those lands and that the 1886 Mdewakantons and their descendants who were assigned plots from the 1886 lands were limited to temporary use and occupancy of those plots. For the reasons discussed below, we conclude that the Interior Department's position is correct—that the 1886 Mdewakantons and their descendants never obtained vested rights in the 1886 lands. In short, nothing in the Appropriations Acts or the conduct of the Interior

---

[5] Because certain terms have been used inconsistently by different sources and at different times, we wish to make clear at the outset that when we use the terms "equitable" or "beneficial" title or ownership with respect to land that is held in trust, we refer to the trust beneficiary's ownership of all interests in the land except for legal title. The plaintiffs in their complaint use the term "equitable title" for that purpose, see Fifth Amended Complaint ¶ 8, and the trial court has used that term most of the time, see Wolfchild I, 62 Fed. Cl. at 534, 540, 543, 549, with some variation, see Wolfchild v. United States, 72 Fed. Cl. 511, 528 (2006) ("equitable interest"); id. at 532 ("beneficial owner").

Department had the effect of conveying equitable title in the 1886 lands to the 1886 Mdewakantons and ultimately to their lineal descendants.

A

The trial court noted that in the 1863 statute that first acknowledged the contributions of the loyal Mdewakantons during the Sioux uprising, Congress authorized the conveyance of land for "each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre of said Indians." Act of Feb. 16, 1863, 12 Stat. at 654. The 1863 statute provided that the property "shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever." Id. That language clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute. The trial court regarded the 1863 statute as relevant to the proper interpretation of the Appropriations Acts, which were enacted 25 years later, stating that the 1888 Act was "motivated in part by the fact that the 1863 Act was not successfully implemented." Wolfchild I, 62 Fed. Cl. at 542.

While Congress's motivation to assist the loyal Mdewakantons no doubt derived in part from the failure of earlier efforts at assistance, it is clear that Congress did not use the 1863 statute as a model for the Appropriations Acts. To begin with, there is a significant difference between the language used in the 1863 statute and the language used in the Appropriations Acts. The 1863 statute referred solely to allotments of land, while the Appropriations Acts referred to the purchase of a wide variety of assets within the discretion of the Secretary of the Interior. Moreover, the first of the two 1863 statutes expressly stated that the beneficiaries would obtain an inheritable interest in the

allotted lands, while the Appropriations Acts say nothing about the nature of the ownership interest in any of the purchased lands. Those differences strongly suggest that Congress intended an approach in the Appropriations Acts different from the approach used in the first 1863 statute.

Even more telling is that the second of the two 1863 statutes, which was enacted only two weeks after the first and superseded it, merely authorized the Secretary to assign land to those who had assisted the white settlers during the uprising; it did not prescribe any particular form of ownership interest in the properties. Instead, it pointedly left open the nature of the interest that the assignees would have in the lands, stating that the lands would be "held by such tenure as is or may be provided by law." Thus, the failure of the 1863 Acts cannot be viewed as leading Congress to create permanent ownership interests in the 1886 lands along the same lines set forth in the first 1863 statute, because the second of the two 1863 Acts left the question of ownership open to later resolution. That approach, of postponing resolution of the ownership question, is the same as the interpretation the Interior Department was later to accord to the Appropriations Acts with respect to the ownership of the 1886 lands.

The plaintiffs point to the references in two of the Appropriations Acts (the 1889 and 1890 Acts) to the "family" or "families" of the 1886 Mdewakantons as suggesting that the Appropriations Acts were intended to create vested ownership rights in the purchased land, as was explicitly proposed in the first 1863 statute. The language of the Appropriations Acts, however, makes clear that the references to the Mdewakantons' families was not directed at creating rights of inheritance in the properties purchased, but instead was simply part of the directive to the Secretary as to

the scope of his discretion in spending the appropriated funds. The 1890 statute, for example, directed that the funds were to be spent on such items as lands, agricultural implements, buildings, cattle, horses, food, or clothing "as may be deemed best in the case of each of these Indians or families thereof." Act of Aug. 19, 1890, ch. 807, 26 Stat. at 349. That language makes clear that the authorization for expenditures extended to cover the needs of the families of the beneficiaries, not simply the needs of the beneficiaries themselves. It does not speak to the nature of the interest created in any real property purchased with the funds.

The events immediately preceding the Appropriations Acts shed light on the nature of the course Congress chose in the Appropriations Acts and the reasons for its choice. In the years shortly before the enactment of the Appropriations Acts, Congress had authorized the transfers of land to individual Indians in two different ways. In the General Allotment Act of 1887, ch. 119, 24 Stat. 388, Congress authorized the Interior Department to grant individual Indians permanent interests in land, with the proviso that the conveyances would be subject to a 25-year restriction on alienation during which time the United States would hold the land in trust for the recipients. At the expiration of the trust period, the Act provided, "the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." 24 Stat. at 389. Significantly, even though the first of the Appropriations Acts was enacted only a year after the General Allotment Act, and with respect to the same subject matter as the first 1863 statute, the Appropriations Acts differed from those two predecessors in that it contained no reference to the creation of trust responsibilities or rights of inheritance in the purchased lands.

Also relevant to an assessment of Congress's intentions as to the interests to be conveyed under the Appropriations Acts are the immediately preceding 1884, 1885, and 1886 statutes that sought to make provision for the loyal Mdewakantons. Those statutes used language similar to the language used in the Appropriations Acts, and neither Congress nor the Interior Department gave any indication that they regarded that language as mandating the creation of a trust relationship. In fact, the Interior Department elected to convey the lands purchased with the 1884, 1885, and 1886 funds to the beneficiaries in fee, although it promptly became clear that the fee transfers failed of their purpose when the recipients sold or encumbered the property.

Thus, at the time of the Appropriations Acts, Congress had two recent models before it for conveying land rights to the 1886 Mdewakantons, one of which explicitly created a trust relationship and one of which plainly did not. In drafting the Appropriations Acts, Congress chose the more flexible language that did not expressly create a trust relationship. In this context, the best reading of the Appropriations Acts is that Congress did not elect to create a trust relationship, but instead chose language simply authorizing the expenditure of funds for a particular purpose, with the Secretary of the Interior being given broad discretion to select not only which items to purchase but also, implicitly, what type of interest to convey in any lands that might be purchased with the appropriated funds.

The Interior Department recognized, of course, that Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts. The Secretary of the Interior accordingly sought to ensure that the funds appropriated under the Act would be spent for the benefit of those individuals. With respect to funds that

were used to purchase land (as opposed to personal property that was rapidly consumed), the Secretary adopted a policy designed to promote Congress's intent by assigning the land to individuals from within the group of 1886 Mdewakantons and subsequently to individuals from within the class of the descendants of those Mdewakantons.

Contemporaneous documents make clear that the Secretary of the Interior considered himself bound by the terms of the statutes to reserve the usage of the 1886 lands for members of the particular beneficiary class (the 264 individuals determined by a contemporaneous Interior Department census to constitute the 1886 Mdewakantons), and that he did so by selecting assignees from within that group. Later, in the absence of any congressional direction as to the ultimate disposition of ownership interests in the lands, the Secretary selected successor assignees from the class of lineal descendants of those beneficiaries. In both instances, the Secretary held the property for the use and benefit of individuals selected from a defined class.

Nothing in the text of the Appropriations Acts effected or required the conveyance to any particular Mdewakanton of a permanent interest in the 1886 lands, such as equitable title. Nor did the Interior Department treat the Appropriations Acts as creating any such interest. Although the descendants of an assignee were typically awarded assignments of property after the death of the previous assignee, that practice was not universal, and the descendants were not regarded as having a legal right to that successor assignment. Indeed, to hold that each of the descendants of the 1886 Mdewakantons obtained a small, undivided ownership right in each of the properties purchased with the Appropriations Acts funds—the right that the plaintiffs' theory of this

case suggests they are entitled to—would have defeated the purpose of the original legislation by making it difficult, if not impossible, to maintain the practice of assigning the relatively small plots of the 1886 lands by assigning the plots sequentially to successor assignees. The purpose of the legislation was to provide plots large enough for residential and agricultural purposes, and the assignment practice was designed to keep those plots intact, not to continue subdividing them as the number of descendants grew or to force their sale in order to distribute the sale proceeds among numerous competing claimants.

The fact that the Secretary adopted a policy of assigning plots of the 1886 lands to the descendants of the 1886 Mdewakantons does not conflict with the government's position that the descendants of the 1886 Mdewakantons did not hold equitable title to the 1886 lands. To the contrary, as we discuss below, the evidence as to the policy and practice of the Interior Department with regard to the 1886 lands over the years demonstrates that the Department did not regard the 1886 Mdewakantons and their descendants as the beneficial owners of those lands.

B

In the years immediately following the Appropriations Acts, the Interior Department began assigning parcels of the 1886 lands to individual Mdewakantons. As early as 1889, the Secretary of the Interior set forth the Department's policy with respect to the beneficiaries' rights in the assigned properties. In a letter to the Commissioner of Indian Affairs, the Secretary instructed that after appropriate purchases of land had been made and the particular qualifying beneficiaries selected, the plots should be assigned "with a form certificate of occupancy." The Secretary envisioned that the

certificate would provide that the assignee was being awarded the use of the land with title being reserved in the United States. The Secretary added that a patent to the land might be issued "with such limitations as shall be required by law, at such time hereafter as shall be authorized by the statutes." Thus, the Secretary concluded that the issue of "further conveyance thereof to the Indians" would be left "subject to such further determination as may be authorized by law." By that means, the Secretary noted, "the Indians will not be able to dispose of or incumber said lands, and title can be withheld from those, if any, who fail to occupy and make proper use of the portion assigned to them." With the question of the ultimate ownership of the lands left subject to later legislative action, for the time being all that was to be conveyed to the 1886 Mdewakantons was a temporary right of occupancy.[6]

That remained the policy of the Interior Department throughout the period between 1888 and 1980. According to a 1904 report, most of the purchased lands had already been assigned to individual qualifying Mdewakantons, although the early assignments were not documented by certificates as the Secretary had instructed. By the early part of the twentieth century the lands that had been purchased with the

---

[6] Based on an 1899 letter from the Acting Commissioner of the Office of Indian Affairs, which refers to the 1886 lands as being "held in trust for [the 1886 Mdewakantons]," the plaintiffs argue that the Interior Department recognized from the outset that the Appropriations Acts create a trust relationship with the 1886 Mdewakantons. The 1899 letter, however, is entirely consistent with the Secretary's earlier articulated policy and does not support the plaintiffs' contention that the 1886 Mdewakantons had obtained a vested interest in the 1886 lands. The letter does not suggest that the beneficiaries of the Appropriations Acts enjoyed equitable ownership of the lands or any interest other than the right of occupancy and use. To the contrary, the letter stated, in accordance with the Secretary's 1889 letter, that "the title to all the land purchased [by an Interior Department agent under the Appropriations Acts] is still vested in the United States . . . and that in all probability steps will be taken at an early day looking to the allotment of said lands by the Department to such Indians as the late Agent has designated."

Appropriations Acts funds had been divided into 89 parcels and had been assigned to selected individuals from among the 1886 Mdewakantons.

Beginning in 1905, the Department formalized the assignments through documents known as Indian Land Certificates. Those documents authorized each assignee to reside on or use the land either for his lifetime or until he abandoned the land. When a particular assignment ended, either by the death of the assignee or when the assignee abandoned the land or otherwise violated the terms of the assignment, the Interior Department would select another assignee for the plot in question. Frequently, the Interior Department would assign a plot to the child of the previous assignee, but sometimes another descendant of the 1886 Mdewakantons would be given the assignment. In some instances, the lands were leased to persons other than the descendants of the 1886 Mdewakantons, in which cases the lease proceeds were kept in an account for the 1886 Mdewakantons and their descendants.

The Indian Land Certificates that were issued to document the assignment of the 1886 lands stated that the property was held "in trust, by the Secretary of the Interior, for the exclusive use and benefit of the said Indian, so long as said allottee or his or her heirs occupy and use said land."[7] In the event that the beneficiary should abandon the land, the certificates provided that the land would be "subject to assignment by the Secretary of the Interior to some other Indian who was a resident of Minnesota May 20, 1886, or a legal descendant of such resident Indian." The trial court concluded that the

---

[7] Some of the later-issued certificates, which are included in the record, omitted the use of the term "trust" and instead stated that the assignee "is entitled to immediate possession of the land for his or her lifetime, as long as he or she shall occupy and use the land," with the assignment being nontransferable and subject to cancellation if the assignee ceased to use and occupy the property as his or her principal place of residence.

language of those certificates supports the interpretation of the Appropriations Acts as dictating that the 1886 lands were to be held in trust for the 1886 Mdewakantons and their descendants as trust beneficiaries, and that the beneficiaries were accorded equitable ownership rights in the 1886 lands. Wolfchild I, 62 Fed. Cl. at 541-42; Wolfchild II, 68 Fed. Cl. at 791.

We do not interpret the Indian Land Certificates in that manner. While it is true that the Indian Land Certificates used the term "trust" and referred to the assignee "and [his or her] heirs" as being "entitled to immediate possession of said land," the certificates did not state that they conveyed or reflected the conveyance of vested interests in the assigned lands. Instead, they referred to the conveyed interest as only the right of occupancy and use.

The interpretation of the Indian Land Certificates as conveying only the right of temporary occupancy and use is supported by this court's decision in Cermak v. Babbitt, 234 F.3d 1356 (Fed. Cir. 2000), another case dealing with the rights of the 1886 Mdewakanton descendants in the 1886 lands. In Cermak, we stated that the record "reveals that the Secretary elected to convey only temporary use and occupancy rights to individual Indians and used Indian Land Certificates to effect the assignment of these rights." Id. at 1363. Although this court's specific holding in Cermak—that the Appropriations Acts did not result in allotments of the 1886 lands under the General Allotment Act—is not squarely dispositive of the argument made by the plaintiffs in this case, the court's conclusion that the 1886 Mdewakantons obtained "only temporary use and occupancy rights" in the 1886 lands provides support for the government's position

that the Indian Land Certificates did not convey or document the conveyance of beneficial ownership of the 1886 lands.

The district court in Cermak v. Norton, 322 F. Supp. 2d 1009 (D. Minn. 2004), aff'd, 478 F.3d 953 (8th Cir. 2007), reached the same conclusion. There, the same plaintiffs again challenged the Interior Department's decision that the assignment of two plots from the 1886 lands to their ancestor, John Cermak, conveyed only a life interest in that property and did not give them rights of inheritance with respect to those lands. The court concluded that the Interior Department's position—that the 1886 land assignees obtained no beneficial interest in the assigned lands—had been consistent and constituted a reasonable interpretation of the pertinent statutes. 322 F. Supp. 2d at 1015. The Eighth Circuit affirmed, noting that the Interior Department's longstanding policy had been that the Indian Land Certificates bestowed only a temporary tenancy conditioned on personal occupancy and use, "rather than an ownership interest that the Certificate holder's heirs may inherit." 478 F.3d at 957.

Finally, in administrative adjudications, the Interior Department construed the Indian Land Certificates in the same way. See Brewer v. Acting Deputy Assistant Sec'y-Indian Affairs, 10 I.B.I.A. 110 (1982); In re Estate of Gofas, Indian Probate No. TC 389S-81, at 41-42 (Interior Office of Hearings and Appeals Oct. 26, 1990) ("despite the ambiguous language contained in the Indian Land Certificate form itself, the Bureau of Indian Affairs and the Department of the Interior have consistently interpreted this document as granting to the certificate holder only a right of use and occupancy for life, subject to the conditions contained therein"). The Indian Land Certificates therefore do

not establish that the assignees who held those certificates were trust beneficiaries who owned a beneficial interest in the 1866 lands.

C

In addition to relying on the text of the Indian Land Certificates, the plaintiffs point to various statements by Interior Department officials in which those officials referred to the relationship between the government and the 1886 Mdewakantons as having the character of a trust. It is true that there is some variation in the way that Interior Department officials have characterized that relationship over the years. As we have noted, however, the label given to the relationship is not as important as the substance of the respective parties' rights. And as to that issue, the Interior Department's position has been consistent: The 1886 Mdewakantons and their descendants were eligible for assignments conveying temporary use and occupancy rights in the land, but they did not obtain vested rights that reflected beneficial ownership interests in the property.

In 1915, the Interior Department was forced to address the issue of the nature of the rights attendant to the assignments of the 1886 lands. That issue came to a head as a result of several inquiries concerning whether the assignments of portions of the 1886 lands gave rise to an inheritable interest in the assigned plots. In one case, the original assignee occupied a small plot until his death. If the assignment were deemed a vested and inheritable interest, the plot would be divided among his three heirs. After some internal debate, the Interior Department concluded that the assignments did not create vested inheritable rights, that both legal and equitable title are in the United States, and that the Secretary of the Interior could select a successor assignee rather than being bound to dispose of the property in accordance with the laws of inheritance.

The position taken by the Interior Department in 1915 as to the ownership status of the 1886 lands is reflected in two memorandums signed off on by the Assistant Secretary. The first memorandum set forth the Department's position that the assignees of the 1886 lands "possessed no other title than a right of occupation of the lands involved, and, therefore, possessed no interest in said lands which was of the nature of an estate of inheritance." Under the Indian Land Certificates, according to the memorandum, the right conferred on the assignees was not a vested right, but was merely a tenancy at will that terminated with the death of the occupant. With respect to the ownership interests in the land, the memorandum stated the following (emphasis added):

> The Secretary of the Interior has not been authorized to hold these lands in trust for the Mdewakanton Sioux. These lands may not be disposed as trust lands. They may not be sold with the approval of the Secretary of the Interior, and both legal and equitable title are in the United States.

Accordingly, the memorandum concluded, the Secretary was not required to split up a small assigned tract among multiple heirs, but had discretion to assign the tract and could, for example, assign it to the particular heir who had "improved and lived on the tract and is willing to continue to do so."

A second memorandum issued later that year after further internal debate set forth the Department's intention to adhere to its policy of reassigning "the vacant tract in each case to the Mdewakanton Sioux Indian who appears to be most equitably entitled to have the temporary use and occupancy of it." That memorandum concluded that the Appropriations Acts "did not intend to sanction any vesting of a legal interest in these lands by the occupants"; rather, according to the memorandum, Congress intended for

the land to be "disposed of in a manner which was deemed best by the Secretary of the Interior, and that he deemed it best not to dispose of any permanent interest in these lands pending further legislation which has not yet been enacted."  In light of the fact that many of the tracts were very small—from three to seven acres—the memorandum observed that if the property had to be shared with numerous heirs of the former occupant, "it would result in much confusion and hardship, and practically in an ejectment of the Indian who is most equitably entitled to live on the land, or who may be actually in possession, living upon it as his only home, and cultivating it to his best advantage."  The memorandum noted that in many instances heirs not already living on the property "are amply provided for elsewhere," and many of them had left the area and therefore were not good candidates to continue the occupancy and use of the property.

The second memorandum, like its predecessor, rejected the suggestion that the assignees of land purchased under the Appropriations Acts obtained equitable title to that land.  It noted that the preferred approach of making reassignments on equitable grounds rather than as a matter of inheritance had been used for years and had elicited very few complaints.  Accordingly, the Department decided to continue reassigning the 1886 lands for temporary use and occupancy "until such time as additional legislation is procured authorizing allotments in severalty on such lands."

In the years following the 1915 policy determination, the Interior Department adhered to its position with respect to the ownership interests in the 1886 lands.  For example, in 1933 when a question was raised as to the ownership rights to two of the 1886 tracts, the Department advised that title to the tracts was in the United States,

"assignees or their heirs possessing only the right of occupancy and use," and that the lands "are not of an inheritable status." Similarly, in a 1937 decision regarding the reassignment of a tract that was abandoned by the assignee, the Department noted that the 1886 lands "were purchased for the Indians by the United States. No trust is created in the deeds."

To be sure, the Interior Department has consistently recognized that in the original legislation Congress intended for the appropriated funds to be expended for the benefit of the 1886 Mdewakantons. Consistent with the principle that there is a "general trust relationship between the United States and the Indian people," United States v. Mitchell, 463 U.S. 206, 225 (1983), Interior Department officials often characterized the 1886 lands as being held in trust for the 1886 Mdewakantons and their descendants, even though the 1886 Mdewakantons were not a tribe of Indians, but rather were viewed as a group of individuals who had severed their tribal relations and were in need of assistance. The Department made clear, however, that its treatment of the 1886 lands as held in trust status for the 1886 Mdewakanton descendants did not give those beneficiaries any interest other than a potential right of temporary occupancy and use of the lands. And the Department recognized that the lands had been acquired by the United States in fee with no formal trust designation. For example, a 1970 Interior Department memorandum stated that the original legislation authorized the purchase of lands to be used for the benefit of the 1886 Mdewakantons "without trust designation or other limitation in title." The memorandum concluded that in accordance with the original legislative purpose the lands should remain available only for the use of

"qualified Mdewakanton Sioux Indians."  To change the status of the lands, it added, "Congress should be asked to permit such action by affirmative legislation."

A 1974 opinion letter from the Solicitor's office at the Interior Department sets forth the most definitive statement of the Department's position as to the legal status of the 1886 lands shortly before the enactment of the 1980 statute.  The opinion letter noted that the legal title to the 1886 lands was taken by the United States, that tenancies at will, or defeasible tenancies, were granted in the form of land assignments to members of the beneficiary class (the 1886 Mdewakantons and their descendants), and that in some instances leasehold interests had been granted to non-members of the beneficiary class, with the income being expended for the benefit of reservation communities "in which members of the beneficiary class reside or with which they are affiliated."  The opinion letter concluded that the lands were best viewed as being held by the United States in trust, with the Secretary "possessing a special power of appointment among members of a definite class," and having the authority to grant an interest in the form of either a tenancy at will or a defeasible interest in the land.  The opinion letter makes clear that its conclusion that the lands were held in trust did not mean that the 1886 Mdewakantons and their descendants owned equitable title to the 1886 lands.  To the contrary, the opinion letter stated, "[w]hen the present arrangement was established, indications are that it was intended as a temporary arrangement and a permanent legislative solution was contemplated."  The opinion letter recommended that the Bureau of Indian Affairs "undertake to ascertain whether some legislative disposition of beneficial title to these lands consistent with the present situation is practical and can be recommended to the Congress."

The 1974 memorandum highlighted the point that the key question regarding the rights at issue in this case is not whether the 1886 lands were held "in trust" for the 1886 Mdewakanton descendants to whom they were assigned, but rather what rights were conferred in the assigned lands. Plaintiffs' theory is that the class consisting of the 1886 Mdewakantons and their lineal descendants obtained equitable title to the 1886 lands, such that each of them was legally entitled to a share of the proceeds of those lands. The government's theory is that the 1886 Mdewakantons were merely the intended beneficiaries of a congressional appropriation, and their descendants were merely the beneficiaries of an interim Interior Department policy designed to approximate Congress's purpose in the Appropriations Acts pending legislation settling the ownership issue. We conclude that the latter is the better view in light of the purpose of the Appropriations Acts and the subsequent history pertaining to the administration of the 1886 lands. In so doing, we think it significant that throughout the period between the enactment of the Appropriations Acts and the passage of the 1980 Act that directed that the 1886 lands be held in trust for the three communities, the Interior Department's consistent position was that the lands were meant to be held in small plots for a small number of individual Mdewakantons living on or near the lands, not collectively for the entire class of Mdewakanton descendants, wherever they might be found.

In sum, we find no persuasive support in the history of the Interior Department's policies with respect to the administration of the 1886 lands that supports the plaintiffs' theory that the Appropriations Acts created permanent beneficial rights in the descendants of the 1886 Mdewakantons. Consistent Interior Department practice was to assign plots of those lands to individuals chosen from among the 1886

Mdewakantons and their descendants, but there was no suggestion in the administrative practice that the beneficiaries obtained equitable title or any other vested rights in those lands.

D

The plaintiffs argue that several twentieth-century statutes show that Congress intended to create a trust relationship with respect to the 1886 lands through which the descendants of the 1886 Mdewakantons obtained an undivided equitable interest in those lands and their proceeds. We conclude that the statutes on which the plaintiffs rely do not support their position.

The plaintiffs first point to a 1901 statute in which Congress authorized the sale of a small parcel of the 1886 lands in Redwood County, Minnesota, and provided for the purchase of another parcel in exchange. The significance of that legislation, according to the plaintiffs, is that it required "the written consent of the adult Indians residing in Redwood County" before the sale could be effected. See Act of Feb. 25, 1901, ch. 474, 31 Stat. 805, 806. Invoking general principles of trust law—in particular the requirement that in some circumstances the consent of the beneficiaries is required to terminate a trust—the plaintiffs contend that the requirement of consent suggests that the property was being held in trust for the Indians. The plaintiffs also rely on the remarks of Senator Pettigrew regarding the legislation, in which he stated that the 1886 Mdewakantons were not a "band of Indians," but "are occupying separate tracts and have the title." 34 Cong. Rec. 2523 (1901).

The statutory requirement to obtain consent for the sale from the adult Indians in Redwood County does not demonstrate the existence of a trust. Instead, it appears

simply to reflect congressional recognition that the 1886 lands were intended for the use of the 1886 Mdewakantons and that it was therefore appropriate to afford them the right to object to any proposed disposition of those lands. Indeed, the Senate report on the bill refers to the consent requirement and does not in any way suggest that it is tied to any requirements of trust law. See S. Rep. No. 56-2186, at 2 (1901). As for Senator Pettigrew's comment, his statement that the Mdewakantons "have the title" is not supported by any analysis and is contrary to the position taken by the Secretary of the Interior contemporaneously with the enactment of the Appropriations Acts, as noted above. Absent any other evidence that the Mdewakantons "ha[d] the title" to the 1886 lands, Senator Pettigrew's statement simply appears to be in error.

The plaintiffs argue that subsequent Acts of Congress provide further proof that Congress understood that those lands were held in trust for the Mdewakantons and their descendants. In our view, those statutes provide no support for the plaintiffs' argument, and in fact support the contrary inference.

In 1906, Congress authorized the sale of a small portion of the 1886 lands on the condition that the proceeds of the sale be paid to the current assignees or that the proceeds be used for the purchase of lieu lands elsewhere. Act of Mar. 19, 1906, ch. 962, 34 Stat. 78. Nothing in the text of the statute states or suggests that either the particular assignees who occupied the property at the time or the 1886 Mdewakantons and their descendants in general had an ownership interest in the property. The two reports accompanying the legislation both recited that the land "belongs to the United States," and both added that the land "was at one time intended that it should be

allotted to certain Indians, but it has never been so allotted." S. Rep. No. 59-1636, at 1 (1906); H.R. Rep. No. 56-1576, at 1 (1906).

Unlike the 1901 statute, the 1906 statute did not require the consent of the assignees (or anyone else) before effecting the transaction. Thus, whatever force the plaintiffs' argument about the consent requirement might have with respect to the 1901 statute, that argument is not applicable to the 1906 statute. In fact, the absence of any provision for obtaining the consent of any of the 1886 Mdewakantons undermines the plaintiffs' argument that Congress regarded the 1886 Mdewakantons as the equitable owners of the land. Congress's decision to compensate the particular affected assignees by giving them the proceeds from the sale or obtaining lieu lands in exchange for the sold property thus appears to be an effort to minimize the burden of depriving the particular assignees of their temporary use and occupancy of the property, not an acknowledgement that the class of 1886 Mdewakantons and their descendants held an ownership interest in the land.

A statute enacted in 1923 provides further evidence that Congress did not regard the Appropriations Acts as having conferred any ownership rights on the 1886 Mdewakantons and their descendants. In that statute, Act of Feb. 14, 1923, ch. 76, 42 Stat. 1246, Congress extended the provisions of the General Allotment Act of 1887 to the properties purchased with the Appropriations Acts funds, which had the effect of authorizing the Secretary of the Interior to allot the properties to particular individuals from among the 1886 Mdewakantons and their descendants. Significantly, the legislative history of the 1923 Act indicates that the 1886 Mdewakantons were not regarded as having any ownership interest in the property. To the contrary, in the letter

recommending enactment of the legislation, the Acting Secretary of the Interior explained that the Appropriations Acts did not specifically indicate the manner in which title would be held to the 1886 properties, and noted that the "United States now holds the title in fee to all those lands." H.R. Rep. No. 67-1379, at 1 (1923). The letter continued, "The legal title to all the above purchased lands, as herein indicated, is in the United States, the Indians having the use and occupancy only." Id.; see also S. Rep. No. 67-129, at 1 (1921).

Furthermore, if the 1923 statute had been implemented, the effect would have been to allot the 1886 lands to a small number of the 1886 Mdewakantons—presumably those with assignments at the time. Such a step would have deprived the other members of the class of 1886 Mdewakanton descendants of any present or future interests in the 1886 lands. Accordingly, Congress's decision in 1923 to authorize the allotment of the 1886 lands is contrary to the plaintiffs' contention that they obtained vested rights in those lands through the Appropriations Acts.

Although the 1923 statute authorized the Secretary to make individual allotments of the 1886 lands, the Secretary elected not to do so. In the years following that Act, federal Indian policy changed from favoring individual allotments to supporting tribal self-determination, a policy change that culminated in the enactment of the Indian Reorganization Act of 1934. It was under the authority of that Act that the three Mdewakanton communities were organized and reservations granted for them.[8]

---

[8]    The plaintiffs have called our attention to the Supreme Court's recent decision in Carcieri v. Salazar, No. 07-526 (Feb. 24, 2009), which involved the construction of a provision of the 1934 Act. They contend that Carcieri supports their argument that the Appropriations Acts created a trust for the 1886 Mdewakantons and their descendants. We do not regard Carcieri as in any way relevant to that issue.

The effect of that change in policy was manifested in a 1944 statute that authorized the Department of the Interior to purchase two small tracts of the 1886 lands for a Wildlife Refuge. The 1944 statute, Act of June 13, 1944, ch. 243, 58 Stat. 274, stated that the subject properties, which had been acquired pursuant to the Appropriations Acts for Indian use, were "no longer used by Indians." It then provided that as part of the transaction, a total of $1,261.20 would be made available for transfer on the books of the Treasury Department "to the credit of the Medawakanton and Wahpakoota Bands of Sioux Indians" and that the payment "shall operate as a full, complete, and perfect extinguishment of all their right, title, and interest in and to the lands above described." Id.

The plaintiffs argue that the payment and the reference to the "right, title, and interest" in the two tracts of the 1886 lands indicates that Congress recognized an equitable interest in the 1886 lands. The problem with that argument is that the payment was made to a tribe, not to a group of individuals, and in particular not to the lineal descendants of the 1886 Mdewakantons. Thus, the 1944 statute demonstrates that Congress appreciated that the 1886 lands were purchased for the general purpose of benefiting the 1886 Mdewakantons, and that it was appropriate that some compensation be paid for the disposition of that property. But it is contrary to the conclusion that any particular individuals had obtained vested rights in that property as to which consent or compensation was legally required before the property was sold.

The most significant twentieth-century legislative action bearing on the status of the 1886 lands is, of course, the 1980 statute that terminated the assignment system and placed the 1886 lands in trust for the three communities. That statute and its

legislative history make clear that Congress did not regard the Appropriations Acts as having conferred equitable title in the 1886 lands on the 1886 Mdewakantons and their descendants.

The committee reports on the 1980 legislation recognized that the 1886 lands were held by the United States for the use of the 1886 Mdewakantons and their descendants. See S. Rep. No. 96-1047, at 1-2 (1980); H.R. Rep. No. 96-1409, at 2 (1980). But the reports did not suggest that the 1886 Mdewakantons, either individually or collectively, held beneficial title to the 1886 lands. To the contrary, as the Senate report noted, the lands were owned by the United States pursuant to an "unusual" arrangement under which the land was made available for assignment to eligible beneficiaries of the three Appropriations Acts. S. Rep. No. 96-1047, at 2. Because that arrangement did not give vested rights to the land to any of the descendants of the 1886 Mdewakantons, Congress was free to alter the ownership status of the land to create trusts for the three communities.[9] See N. Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 656 (1976); United States v. Jim, 409 U.S. 80, 82 (1972); LeBeau v. United States, 474 F.3d 1334, 1342-43 (Fed. Cir. 2007).

It was clear to those who proposed the 1980 legislation that despite the overlap among the descendants of the 1886 Mdewakantons and the membership of the three

---

[9] The sponsor of the 1980 Act in the House, Rep. Richard Nolan, explained that under the Appropriations Acts, the 1886 lands were "held by the United States for exclusive use by descendants of the May 20, 1886, Mdewakanton Sioux," unlike the reservation land, which "belonged to all Mdewakanton residing on each reservation, according to membership requirements stipulated by the tribe." 126 Cong. Rec. 8897 (Apr. 23, 1980) (remarks of Rep. Nolan). The 1980 Act, he explained, "will put [the 1886 lands] on an equal status with [reservation] land," and the "change in the legal status of the 1886 Mdewakanton land will place all Mdewakanton lands on an equal basis." Id.

communities, some of the 1886 Mdewakanton descendants would cease to be beneficiaries under the new statute. An Interior Department memorandum describing the effect of the proposed transfer of the 1886 lands to be held in trust for the three communities specifically acknowledged that, because of the lack of complete overlap between the membership of the communities and the descendants of the 1886 Mdewakanton, some individuals could lose the opportunity for occupancy and use of those properties under the proposed legislation. The memorandum stated:

> [T]here are, potentially, a number of Indian people who are eligible descendants entitled to use rights in this property but who are not members of any of the three Indian communities and would, therefore, not acquire any rights (they may in fact lose rights) by the proposed change in the title to this property. There is no provision in the Bill to protect any such property rights there may be.

That acknowledgement makes clear that the Interior Department understood that the rights of the Mdewakanton descendants were limited to eligibility for use and occupancy of the 1886 lands, not equitable ownership.[10] In fact, the "savings clause" that preserved occupancy rights for all those then holding assignments to portions of the 1886 lands was added to the bill, perhaps in an effort to mitigate the effect of the new statute on those who were not members of the communities and would otherwise lose their current right of occupancy of the 1886 lands.

From our survey of the various statutes enacted in the aftermath of the Appropriations Acts, we see no evidence that Congress interpreted the Appropriations Acts as creating a trust relationship with the 1886 Mdewakantons. Nor do we see any

---

[10] The plaintiffs argue that the quoted statement was in a document relating to a bill introduced in an earlier Congress. The earlier bill and the Act ultimately passed in 1980, however, were nearly identical. The process of obtaining the 1980 legislation was an ongoing one that simply spanned more than one Congress. The document is therefore properly viewed as part of the legislative history of the 1980 Act.

indication that Congress wished, in the subsequent legislation, to convert the relationship between the government and the 1886 Mdewakanton descendants into a trust relationship in which the descendants would be treated as beneficial owners of the 1886 lands.

E

In addition to invoking subsequent legislation and administrative practice, the plaintiffs seek support for their position in several court decisions and in positions taken by government lawyers in previous cases involving the 1886 lands. None of those arguments is persuasive.

First, the plaintiffs and the Lower Sioux Indian Community rely heavily on the Court of Claims' decision in <u>Duncan v. United States</u>, 667 F.2d 36 (Ct. Cl. 1981). That case involved a series of statutes that authorized the purchase of land for certain Indians in California. The first of those statutes authorized the Secretary of the Interior to purchase lands and water rights for the use of the designated Indians, to construct suitable irrigation facilities on those lands, and to "fence, survey and mark the boundaries of such Indian Reservations." Act of June 21, 1906, Pub. L. No. 258, ch. 3504, 34 Stat. 325, 333 (1906). Subsequent statutes renewed the authorization in similar terms, and suitable property was purchased with the appropriated funds. In 1958, Congress enacted a statute that provided that the trust relationship with respect to the lands would be terminated under certain conditions and the land turned over to individual Indians. <u>See</u> Pub. L. No. 85-671, 72 Stat. 619 (1958). The Indians later filed an action for breach of trust, contending that the government had not satisfied the statutory requirements for termination of the trust. The Court of Claims ruled that the

California lands were held in trust for the Indians and that the government was liable for breach of trust because of its unauthorized, premature termination of the trust.

The plaintiffs contend that the land purchases in this case and the purchase at issue in the Duncan case are very similar, and that the purchases in this case therefore must be treated as creating the same kind of trust relationship that was found to exist in Duncan. While there are some similarities between the two cases, there are important differences that make the Duncan case distinguishable. First, the initial statutes in Duncan expressly authorized the Secretary to procure land for the creation of "Reservations" for the Indians, a term that is typically associated with the creation of a trust relationship between the government and the tribe or community of Indians for which the reservation is created. See Cohen's Handbook of Federal Indian Law §§ 3.04[2][c], at 191; 15.04[3][b], at 982; see also N. Paiute Nation v. United States, 8 Cl. Ct. 470, 485 (1985). Second, as the Duncan court pointed out, the "contemporaneous and continuing interpretation" of the authorizing statutes by the Interior Department was that those statutes created a trust relationship. In fact, the parties' agreed statement of facts contained a stipulation that from the time of the creation of the reservation until its termination, "the Secretary of the Interior recognized a federal trust relationship with the Robinson or East Lake Band, as a distinct Indian tribe or band of Indians." 667 F.2d at 41 n.7. Third, in the 1958 statute that authorized the termination of the reservation, Congress clearly stated its understanding and intention that the reservation lands in question had been and would continue to be held in trust until final termination. See Pub. L. No. 85-671, § 9, 72 Stat. at 621 (providing for

certain benefits to be conferred "[p]rior to the termination of the Federal trust relationship in accordance with the provisions of this Act").

None of those factors is present here. The Appropriations Acts did not create a reservation for the 1886 Mdewakantons; there was no consistent and longstanding position by the Interior Department that the Appropriations Acts created a trust giving the descendants of the 1886 Mdewakantons vested rights in the 1886 lands; and the 1980 statute that terminated the relationship created by the Appropriations Acts not only did not refer to that relationship as a trust relationship, but created an entirely different, and inconsistent, trust relationship with the three Mdewakanton communities. Duncan therefore does not control this case.

The plaintiffs also rely on a 1922 decision by the Court of Claims, Medawakanton and Wahpakoota Bands of Sioux Indians v. United States, 57 Ct. Cl. 357 (1922). That case arose after Congress enacted a statute in 1917 directing that the Sioux be awarded a back payment for the annuities that had been revoked by the 1863 legislation. Act of Mar. 4, 1917, ch. 181, 39 Stat. 1195. The 1917 statute directed that the amount of the back payment be reduced by any amounts that had been paid to the tribe and tribal members for their support in the interim. Among the set-off payments were the payments made pursuant to the Appropriations Acts. Nothing in that legislation or the court's judgment indicates that the monies were paid as part of a trust; they were simply funds that were previously paid to the tribe and to former tribe members and, as such, fell within the scope of what Congress had directed to be set off from the overall judgment in that litigation.

Finally, the plaintiffs argue that the government is estopped from denying that the Appropriations Acts created a trust relationship with the 1886 Mdewakantons and their descendants because government attorneys have acknowledged the existence of such a trust in earlier litigation. We have examined the statements relied on by the plaintiffs and do not find anything said by the government attorneys in the referenced cases that would support the plaintiffs' claims in this one. In one instance, the government noted that the Indian Land Certificates documenting the assignments held by particular descendants of the 1886 Mdewakantons referred to the assigned land as "held in trust." Government counsel then stated that the 1980 legislation "changed the status of property represented by Indian Land Certificates" by transferring "property that the United States had held in trust for individual Mdewakanton Sioux, to the Sioux Community." In other instances, again referring to the Indian Land Certificates, government counsel stated the assigned lands were held in trust for individual Mdewakanton Sioux. That characterization of the property relationship reflected by each assignment is consistent with the way the Interior Department frequently characterized the assignments, but it falls far short of endorsing the plaintiffs' position that the United States held the 1886 lands in trust for the class of the 1886 Mdewakanton descendants and that the trust relationship rendered the members of that class equitable owners of those lands.

In another instance cited by the plaintiffs, a government attorney stated that the 1980 law "said we're not changing anybody's existing rights." In context, it is clear that the attorney's statement referred to the effect of the savings clause of the 1980 Act in

preserving the rights of existing assignees, not to the overall effect of the Act in giving beneficial title to the three communities.

In sum, we conclude that, as of the time of the 1980 Act, all indications were that neither Congress nor the Department of the Interior had conveyed any vested ownership rights in the 1886 lands, legal or equitable, to anyone. Instead, those lands were being held by the Department of the Interior for use by the 1886 Mdewakantons and their descendants pending an ultimate legislative determination as to how the ownership interests in the lands should be allocated. That determination came in 1980, when Congress provided that legal title in the lands would be held by the United States, which would hold the lands in trust for the three communities. For that reason, we conclude that the answer to the first of the certified questions in this case—whether the Appropriations Acts created a trust for the benefit of the 1886 Mdewakantons and their descendants—is no.

### III

The second certified question asks whether the 1980 Act terminated any trust created by the Appropriations Acts.

Congress's purpose in the 1980 statute was to alter the ownership status of the 1886 lands. What Congress plainly sought to achieve was to have the United States' interest in the lands converted into a trust for the three communities, whereby the United States would hold legal title to the lands and each of the three communities would hold equitable title to the portions of the 1886 lands allocated to it. The operative language of the statute makes that purpose plain. It states, in pertinent part, as follows:

> That all right, title, and interest of the United States in [the 1886 lands]
> which were acquired and are now held by the United States for the use or

benefit of certain Mdewakanton Sioux Indians [under the Appropriations Acts] are hereby declared to hereafter be held by the United States—

(1) with respect to the some 258.25 acres of such lands located within Scott County, Minnesota, in trust for the Shakopee Mdewakanton Sioux Community of Minnesota;

(2) with respect to the some 572.5 acres of such lands located within Redwood County, Minnesota, in trust for the Lower Sioux Indian Community of Minnesota; and

(3) with respect to the some 120 acres of such lands located in Goodhue County, Minnesota, in trust for the Prairie Island Indian Community of Minnesota.

. . .

. . . The lands so transferred are hereby declared to be a part of the reservations of the respective Indian communities for which they are held in trust by the United States.

94 Stat. at 3262.

The trial court construed that statute as creating a trust in favor of the three communities and in turn requiring the three communities to hold the 1886 lands in trust for the 1886 Mdewakantons. The court further held that as of the time of the 1980 Act, the United States held only legal title to the 1886 lands, and the descendants of the 1886 Mdewakantons held equitable title. Therefore, the court concluded, when the 1980 Act transferred all the United States' right, title, and interest in the land, it transferred only legal title to the lands, and the descendants of the 1886 Mdewakantons continued to hold equitable title. Wolfchild I, 62 Fed. Cl. at 543. The plaintiffs agree with that construction of the statute and contend that they all share beneficial ownership of the 1980 lands in the form of an undivided equitable interest in the disputed property.

The main problem with the plaintiffs' theory is that if their interpretation of the 1980 Act is correct, it is hard to understand what the 1980 Act accomplished. At the time the 1980 Act was enacted, the United States already held legal title to the 1886

lands. According to the plaintiffs, they enjoyed beneficial ownership of the 1886 lands both before and after the 1980 Act, so the Act did not affect their interests in the 1886 lands. Moreover, in the plaintiffs' view the Act did not give the three Mdewakanton communities equitable title to those lands or, so far as we can discern, any other interest in the property. The plaintiffs suggest that although the Act declared that the United States would henceforth hold the 1886 lands in trust for the three communities, the intended effect of the Act was to require the communities in turn to hold that property in trust for the descendants of the 1886 Mdewakantons, who would therefore hold equitable title to those lands. As a result, the communities, although explicitly designated in the Act as trust beneficiaries, would instead become trustees with regard to the property, even though they held no legal or equitable interest in that property.

The plaintiffs argue that their construction would not render the 1980 Act meaningless, because the 1980 Act rendered the lands subject to the communities' political jurisdiction and eligible for encumbrance with long-term leases. But the plaintiffs do not explain what practical impact it would have on the communities for the lands to be "subject to the communities' political jurisdiction" if legal title remained in the United States and equitable title remained in the 1886 Mdewakanton descendants. Moreover, as was explained in contemporaneous Interior Department documents, the availability of the lands for leasing under pertinent regulations depended on the lands being tribally owned. The Interior Department regarded the current status of the lands as barring such leasing. The plaintiffs have not shown how, under their construction of the 1980 Act, the pre-1980 "unusual ownership status of the land," which interfered with issuing long-term leases, see S. Rep. No. 96-1047, at 6; H.R. Rep. No. 96-1409, at 6,

would change in a fundamental way that would affect the eligibility of the land for leasing.[11]

The trial court recognized the awkwardness of the plaintiffs' construction of the 1980 Act, noting that under that construction the Act appeared "to create a trust on a trust." The court, however, concluded that the task of sorting out the precise interests of the parties following the 1980 Act "must be remitted to exploration in future proceedings." Wolfchild I, 62 Fed. Cl. at 544 n.13.[12] The problem arose, according to the court, because the 1980 Act "is so poorly drafted that it is difficult to make sense of its provisions." Id. To the contrary, we conclude that the Act is difficult to understand only if it is viewed in the way the plaintiffs view it—as intended to preserve equitable title to the disputed lands in the 1886 Mdewakanton descendants. If the Act is viewed as creating a trust in which legal title is held by the United States and beneficial title is held by the three communities, the wording of the Act achieves that purpose clearly and simply.

Nothing in the very straightforward language of the statute (and nothing in any of the legislative history) suggests that Congress intended to create a "trust on a trust" or

---

[11]    The plaintiffs suggest in passing that the status of the lands as "reservation" lands under the 1980 Act could "possibly" qualify those lands for leasing under the pertinent regulations. Yet it is the 1980 Act's reference to the conversion of the lands to "reservation" status that is most problematic for the plaintiffs' theory that the 1980 Act left their interests in the 1886 lands unaffected.

[12]    In a later opinion, the court characterized the 1980 Act as having "created an overlay on the earlier trust" and that the government's post-1980 transfer of lands, monies, and other property to the communities made those communities "agents of the federal government in administering the trust on behalf of the trust beneficiaries." Wolfchild v. United States, 72 Fed. Cl. 511, 528-29 (2006). While Congress could certainly devise such an arrangement, we see nothing in the 1980 Act that establishes it, and assigning the communities the role of fiduciary agents is at odds with the statutory language that designates them as trust beneficiaries.

any other elaborate structure in which the three communities would assume some undefined role between the continuing holder of legal title (the United States) and what the plaintiffs see as the continuing holders of equitable title (the 1886 Mdewakanton descendants).  Under the plaintiffs' construction of the statute, the three communities would be designated as trust beneficiaries, but would hold no beneficial interest as a result of the trust.  Instead, according to the trial court, the three communities "have assumed a fiduciary role as agents of the United States . . . in administering the trust on behalf of the trust beneficiaries."  Wolfchild v. United States, 72 Fed. Cl. 511, 529 (2006).  Yet the statutory characterization of the land as being held "for the benefit of" the three communities is not consistent with the rights and obligations of the communities under the plaintiffs' theory or the court's construction.  In addition, under the plaintiffs' theory the expressed purposes of the 1980 Act would not be served, as the problem of the two classes of property and the two classes of Mdewakantons would persist, even though eliminating those two classes of property and holders of property rights was a principal objective of the statute.

A further problem with the trial court's interpretation of the 1980 Act is that it is in tension with the provision in the Act that declares the transferred 1886 lands to be "part of the reservations of the respective Indian communities."  94 Stat. at 3262.  As previously noted, the term "reservation" typically denotes property for which legal title is in the United States and equitable title is in the tribe.  Lands that the Secretary adds to existing reservations are designated by statute as reserved "for the exclusive use of Indians entitled to enrollment or by tribal membership to residence at such reservations."  25 U.S.C. § 467.  In light of that statutory provision dedicating new

reservation lands to the use of tribal members only, it would be anomalous to construe the 1980 Act, which made the 1886 lands part of the three communities' reservations, to mean that those lands would be held in trust for the class of 1886 Mdewakanton descendants, many of whom were not enrolled or eligible for enrollment in any of the three communities.

For the foregoing reasons, even if we construed the Appropriations Acts as creating a trust relationship by implication or by operation of law, we would hold that the 1980 Act terminated that trust. If the Appropriations Acts created a trust for a class consisting of the 1886 Mdewakantons and their descendants, the relationship between the government and the beneficiary class would be akin to the relationship between the government and individual members of a tribe with respect to reservation lands. And as to that relationship, the Supreme Court has held that Congress can freely alter the terms of any provision relating to the distribution of Indian lands at any point prior to the time those interests are allotted or individuals otherwise obtain vested rights in the property. See United States v. Jim, 409 U.S. 80, 82 (1972) (Congress may alter the distribution scheme of an earlier statute that created a trust relationship with a tribe); Sizemore v. Brady, 235 U.S. 441, 449 (1914); Gritts v. Fisher, 224 U.S. 640, 648 (1912). Congress's decision to give the three Mdewakanton communities beneficial ownership rights in the 1886 lands, rather than continuing to hold those lands for the use and benefit of the 1886 Mdewakanton descendants, would therefore be within Congress's power over such property, even if that action were taken over the objection of the original beneficiaries. Because a change in the identity of the beneficiaries does not constitute a taking of property from individuals who had an expectation of benefit but

no vested rights in the property, there is no force to the plaintiffs' argument that if Congress had intended to confer beneficial title to the 1886 lands on the three communities, it would have provided compensation to the 1886 Mdewakanton descendants under the takings clause of the Fifth Amendment.

The trial court made two points in support of its conclusion that the 1980 Act did not terminate the trust created by the Appropriations Acts, but we do not find either of those points persuasive.

First, the court noted that the 1980 Act did not contain express language terminating a trust. Because the Appropriations Acts contained no express language creating a trust, however, it is not surprising that the 1980 Act contained no express language of termination. Even if the Appropriations Acts are regarded as having imposed sufficiently specific duties on the Secretary of the Interior to give rise to a trust relationship with the 1886 Mdewakantons, a trust was, at most, created only by operation of law. Under those circumstances, Congress's failure to include express language of trust termination cannot be regarded as indicative of an intention not to alter the previous legal relationship among the parties.[13]

Second, the court found significance in the savings clause of the 1980 Act, which stated that nothing in the Act shall "alter, or require the alteration, of any rights under

---

[13]    A similar point applies to the trial court's conclusion that construing the 1980 Act to transfer the 1886 lands in trust to the three communities constitutes an implied repeal of the Appropriations Acts, and that the government's construction of the 1980 Act is therefore suspect in light of the doctrine that implied repeals are disfavored. See Wolfchild I, 62 Fed. Cl. at 543-44. We do not agree that the 1980 Act, as construed by the government, would effect a repeal of the Appropriations Acts, implied or otherwise. The 1980 Act simply provides for the long-term disposition of the property purchased pursuant to the Appropriations Acts, an issue left unresolved by Congress both in those Acts and during the ensuing 90 years.

any contract, lease, or assignment entered into or issued prior to enactment." Those provisions, according to the court, indicated that the 1980 Act did not terminate the pre-existing trust. In fact, however, those provisions merely demonstrate that Congress did not intend for the new statute to undermine any current interests represented by existing assignments or contracts. <u>See</u> <u>Brewer v. Acting Deputy Assistant Sec'y-Indian Affairs</u>, 10 I.B.I.A. 110, 120 (1982) (acknowledging that assignees have a property interest protected by the savings clause).

Thus, assignees under existing Indian Land Certificates were allowed to remain in occupancy, but no further certificates were to be issued to successor assignees after the death of the assignees or other termination of the current assignments. Likewise, the 1980 Act did not terminate any rights associated with current leases on portions of the 1886 lands. But that does not demonstrate that the 1980 Act made no change that affected the interests of those who might have expected land assignments or other benefits in the future.

In fact, the presence of the savings clause in the 1980 Act provides affirmative evidence in favor of the government's interpretation of that statute. If the 1980 Act had no effect on the equitable rights of the 1886 Mdewakantons in the 1886 lands, as the plaintiffs contend, there would have been no need for a savings clause to preserve the interests of the current assignment holders from the adverse effects of the 1980 legislation. The fact that the savings clause was regarded as necessary to protect the current assignees is a clear indication that the drafters viewed the Act as otherwise terminating any equitable interests of the 1886 Mdewakantons in those lands.

Significantly, the Department of the Interior, which had drafted the 1980 Act, made clear shortly after the date of enactment that it construed the Act as creating a trust in favor of the three communities and not granting or preserving beneficial ownership rights in the 1886 Mdewakanton descendants. A letter sent to the Lower Sioux Community Council by the Interior Department's Area Director within days of the enactment of the 1980 Act expressed the Department's position that the Act "gives jurisdiction to each Community Council on the same basis as other tribally-owned land," and that, as a result, "the income derived from these lands in the future will be utilized as other income from tribal land."

Similarly, in administrative proceedings following the 1980 Act, the Department made clear that, with the exception of those persons affected by the savings clause, it interpreted the 1980 Act as terminating any interest of the 1886 Mdewakanton descendants in the 1886 lands and instead created a trust relationship with the three communities. See Gitchel v. Minneapolis Area Dir., Bureau of Indian Affairs, 28 I.B.I.A. 46, 48 (1995) ("[T]here is simply no question as to the intent of Congress in 1980 to convey the beneficial title to these lands to the Communit[ies]."); Brewer, 10 I.B.I.A. at 118-19 ("[t]he Department's position concerning these lands has . . . consistently been that they were not made available by Congress for allotment, were never allotted, and were therefore available in 1980 to become tribal lands held by the Department in trust. Congress approved this position when it adopted the 1980 Act."); In re Estate of Gofas, Indian Probate No. TC 389S-81, at 34 (Interior Office of Hearings and Appeals Oct. 29, 1990) (1980 Act declared title to Scott County lands to be vested in the United States "in trust for the Shakopee Mdewakanton Sioux community").

The view of the agency as to the proper construction of the statute is particularly pertinent in a case such as this one, in which the agency drafted the legislation in question, was deeply involved in its enactment, and attached the pertinent construction to the statute roughly contemporaneously with its passage. See Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 788 (1985); Sec. & Exch. Comm'n v. Sloan, 436 U.S. 103, 120 (1978); Zuber v. Allen, 396 U.S. 168, 192 (1969). The proper construction of the 1980 Act is thus confirmed by the clear interpretation of that statute within the agency that proposed, drafted, and supported the legislation.[14]

For these reasons, we conclude that the answer to the second of the certified questions in this case—whether Congress, through the enactment of the 1980 Act, terminated any trust created by the Appropriations Acts—is yes.

---

[14] The parties devote some attention to the question whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds. See Wolfchild I, 62 Fed. Cl. at 549-50. That issue does not affect our analysis of the two certified questions, however, and we leave that issue to be addressed, to the extent necessary, in further proceedings before the trial court.

The parties also engage in a debate over whether the trial court ruled that Congress's enactment of the 1980 Act itself constituted a breach of trust. The suggestion that the court so ruled is based on a passing statement in a later opinion in which the court remarked that the "United States breached the trust engendered by the Appropriations Acts through the passage of the 1980 Act and other actions taken thereafter." Wolfchild v. United States, 78 Fed. Cl. 472, 475 (2007). The plaintiffs contend that the court's remark should not be understood as suggesting that the legislation itself constituted a breach of trust, but "is a reference to the passing of time prior to the 1980 Act and not to 'the passage' of the 1980 Act." Whatever may be the proper reading of that statement by the trial court, it was not part of the court's main opinion on this issue, and in any event it is clear that an Act of Congress cannot constitute a breach of trust for which relief can be obtained from the Court of Federal Claims. See Menominee Tribe of Indians v. United States, 607 F.2d 1335, 1339, 1344-45 (Ct. Cl. 1979).

In light of our disposition of the two certified questions, we reverse and remand for further proceedings in the trial court.

Each party shall bear its own costs for this appeal.

<u>REVERSED and REMANDED</u>.